IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL D. BROWNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-00266-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT
AND AFFIRMING THE DECISION OF THE COMMISSIONER

Plaintiff Michael D. Browning seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and XVI of

the Social Security Act ("the Act"), 42 U.S.C. § 401, et seq. The specific issues for review are:

(1) whether the ALJ's decision employed the proper standard for the burden of proof; (2)

whether the ALJ's residual functional capacity assessment is supported by substantial evidence;

and (3) whether the ALJ's assessment of opinion evidence presented by plaintiff's medical

source is supported by substantial evidence. I find substantial evidence in the record to support

the ALJ's actions; therefore, plaintiff's motion for summary judgment will denied and the

decision of the Commissioner will be affirmed.

## I.    BACKGROUND

This suit involves two applications made under the Social Security Act. The first is an

application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq.

(Tr. at 118-123). The second is an application for supplemental security income ("SSI")

benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. (Tr. at 124-130).  Sections 205(g)

and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), provide for judicial review of a

final decision of the Commissioner of the Social Security Administration ("SSA"). Plaintiff's

claims were denied initially (Tr. at 55-57, 64-73).  On October 27, 2011, following a hearing,

an ALJ found that plaintiff was not under a disability as that term is defined by the Act (Tr. at 17-38).

The ALJ found that plaintiff had the following severe impairments: antisocial personality disorder, depression, coronary artery disease (status post-stent placement) and peripheral vascular disease (status post-bypass surgery) (Tr. at 22). However, the ALJ found that plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1 (Tr. at 23). The ALJ determined that plaintiff retained the residual functional capacity to perform light work except that he must avoid extremes of hot and cold; could only occasionally perform postural activities (i.e., balancing, stooping, kneeling, crouching, crawling, and climbing); could not use ladders, ropes, or scaffolds; and could not work with the public and could tolerate only occasional interaction with coworkers and supervisors (Tr. at 25).

The ALJ found that plaintiff's impairments would not prevent him from performing work that exists in significant numbers in the national economy including work as a collator operator, price marker, or folding-machine operator (Tr. at 32). Therefore, the ALJ concluded that plaintiff was not disabled (Tr. at 33).

On January 16, 2013, SSA's Appeals Council denied plaintiff's request for review (Tr. at 1-6). Therefore, the ALJ's decision is the final action by the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial

2

evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations

are codified at 20 C.F.R. §' 404.1501, et seq. The five-step sequential evaluation process used

by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Alyssa Smith, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

On January 27, 2010, plaintiff filed his applications for disability insurance benefits under Title II, and for SSI under Title XVI (Tr. at 118-123, 124-130, 118-123, 124-130). Plaintiff stated that he was born in 1957, and he initially alleged that he became disabled beginning August 1, 2004 (Tr. at 124).

4

On February 2, 2010, J. Curtis, an employee of defendant, interviewed plaintiff and helped him complete a Disability Report (Tr. at 141-153). Plaintiff alleged his disability based on mental illness, heart problems, and his back (Tr. at 141, 146). Plaintiff alleged that he was last working in May 2004, was arrested in July 2004, released from his job in August 2004 "due to disability," sentenced to prison in May 2005, and released from prison on January 22, 2009 (Tr. at 142). Plaintiff alleged that he stopped working because he "was drinking because of [his] mental illness" (Tr. at 147). The interviewer noted that plaintiff appeared to show pain after getting out of the chair (Tr. at 143-144).

The record shows that plaintiff earned the following income from 1974 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $ 415.84 | 1993 | $ 29,974.18 |
| 1975 | 931.80 | 1994 | 32,329.02 |
| 1976 | 925.82 | 1995 | 39,125.34 |
| 1977 | 925.82 | 1996 | 40,359.98 |
| 1978 | 8,970.67 | 1997 | 33,156.62 |
| 1979 | 11,028.59 | 1998 | 34,815.55 |
| 1980 | 8,640.49 | 1999 | 33,963.54 |
| 1981 | 2,133.51 | 2000 | 40,175.53 |
| 1982 | 5,115.28 | 2001 | 41,881.08 |
| 1983 | 12,354.20 | 2002 | 39,626.19 |
| 1984 | 14,600.91 | 2003 | 41,177.11 |
| 1985 | 16,191.53 | 2004 | 25,066.71 |
| 1986 | 14,014.62 | 2005 | 0.00 |
| 1987 | 16,317.20 | 2006 | 0.00 |
| 1988 | 19,790.93 | 2007 | 0.00 |
| 1989 | 24,992.97 | 2008 | 0.00 |
| 1990 | 23,471.51 | 2009 | 0.00 |
| 1991 | 16,839.98 | 2010 | 0.00 |
| 1992 | 27,184.49 | | |

5

B.  **SUMMARY OF MEDICAL RECORDS**

On May 10, 2006, plaintiff had a mental health intake screening in prison (Tr. at 227). Plaintiff denied a history of psychiatric treatment. He denied a family history of psychiatric treatment but reported a suicide by his uncle. He denied a history of violence/assault. He denied any history of sexual, physical or mental abuse. He admitted a history of drug use to include alcohol, marijuana, PCP, LSD, and cocaine. He denied a history of suicide attempts and denied any mental health distress or concerns. His mental status exam was "within normal limits re: oriented x3, reality testing, directed thought, mood, affect, appetite, sleep; no blatant indications of hallucination, delusions, homicidal and/or suicidal ideation/intent/plan." Plaintiff showed no symptoms of acute or serious depression.

On January 6, 2009, plaintiff reported that before prison he took Paxil and Zoloft for about a year (Tr. at 228). He reported difficulty sleeping and participating in groups. Plaintiff "believes he may need meds again for anxiety." He was described as polite and cooperative. He spoke freely without prompting. He was observed to be somewhat anxious.

On January 26, 2009, plaintiff had x-rays which showed "some minimal degenerative changes" in the lumbar spine (Tr. at 259).

On February 2, 2009, plaintiff was observed to be polite and cooperative, no symptoms of psychosis were observed (Tr. at 288). His thoughts were well organized and his affect was appropriate.

On March 16, 2009, plaintiff reported feelings of depression, racing thoughts and difficulty concentrating (Tr. at 229). He was alert and oriented times three, his speech and affect were appropriate, he presented no psychotic features, his thoughts were well organized.

6

On April 6, 2009, plaintiff reported being paranoid and said everyone was laughing at him (Tr. at 229-230). He was still in prison. He was described as "depressed/sad." He also reported that while playing handball he fainted (Tr. at 269).

On April 22, 2009, plaintiff's counselor wrote, "At this time, he does not appear appropriate for placement in psychiatric clinic." (Tr. at 230).

On April 28, 2009, plaintiff was described as "argumentative, verbally combative because he believes he needs meds and we are not scheduling him to see a doctor, we offered to continue with talk therapy." (Tr. at 230).

On May 4, 2009, plaintiff had a treadmill stress test which showed evidence of developing cardiomyopathic process (weakening of the heart muscle) but without definite evidence of underlying ischemia (reduced blood flow to the heart due to blockage) (Tr. at 270-271, 328-330).

On May 6, 2009, plaintiff was noted to "complain of a plethora [of] mental health issues." (Tr. at 231). Plaintiff said he had been treated for depression and anxiety at Two Rivers Hospital in Kansas City from 1996 to 1998, even though during his mental health intake screening he had denied ever having had psychiatric treatment. "I also ask if there was anyone on the outside who knows him well and [if] he [would] give me authorization to speak with them for background information. The offender declined." Plaintiff was observed to be rational and oriented, his thoughts were directed and well organized. No symptoms of psychosis were observed.

On May 19, 2009, plaintiff was admitted to the "chronic care clinic" and his MH score[1] was elevated from 1 to 3 (Tr. at 231-234). His problems were reported to be depressed

_____

[1]The Missouri Department of Corrections has a mental health classification system that guides staff to provide for the individual needs of each offender. The five-point scale in this system includes: MH1- no mental health needs; MH2- mild or occasional needs; MH3 - moderate needs, usually means the individual is on psychotropic medication but symptoms are

7

mood and "social phobia of speaking in groups." Plaintiff reported he was paranoid all the time and was hearing a man's voice. He stated that at age 17 police interrupted his plan to commit suicide using a shotgun, even though during his mental health intake screening he had denied any history of suicide attempts. He reported a history of physical, emotional and sexual abuse by his parents, even though he had denied all of these things during his mental health intake screening. His short term memory was noted to be good. "Poor eye contact. Offender speaks in generalities and avoid[s] specific information. . . . Does not want the treatment team to contact anybody in the family to verify his current claim of past problems." The writer noted that plaintiff had a very confusing psychiatric history, having initially denied all of the history he recently claimed and having spent the last three years of his incarceration with no mental health complaints. "He appears to endorse every symptom in the DSM and finally says, 'you tell me what is wrong with me.'" Plaintiff was coherent, cooperative. He did not show any signs of thought blocking, psychomotor retardation or hyperactivity, pressure of speech, flight of ideas, disjointed speech, etc., "which would be expected in the presence of mood or psychotic disorders." He had no indication of impaired retention or recall. "There is evasiveness, argumentativeness, and a sense of entitlement and victim stance. There is presence of underlying anger and rationalization of behaviors." He was assessed with mood disorder not otherwise specified, polysubstance dependence, borderline personality disorder, and a GAF of 65.[2]

---

under control and responding well to treatment; MH4 – more serious needs, the illness is not adequately controlled and specialized housing may be needed; MH5 – very poor functioning, this means the individual will either be housed at the Biggs Correctional Treatment Center or at DOC's Correctional Treatment Center at Farmington.

[2] A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

On June 3, 2009, plaintiff saw the prison doctor who characterized plaintiff's treadmill stress test results as normal (Tr. at 277).

On June 10, 2009, plaintiff saw the prison psychiatrist (Tr. at 235-236). "He stays very depressed and is not sure whether he can make it after his release. He is old and will be labeled as a sex offender. He will not have enough money to pay for the treatment which he will have to get in order to fulfill his obligations while on parole, etc. He says that when he was on Zoloft and Paxil in the community he was much level headed and was able to focus. When asked why he did not continue the medication he stated that he thought that he could achieve the same levelheadedness by using alcohol and drugs". He was assessed with mood disorder not otherwise specified, polysubstance dependence, borderline personality disorder, and a GAF of 65. Zoloft was prescribed.

On June 18, 2009, plaintiff saw the prison psychiatrist (Tr. at 236-237). Plaintiff reported feeling "a lot improved" with the medication and was able to focus. "He is in contact with his mother who is ill with COPD and has to be on oxygen." His diagnoses were the same, his GAF was 65.

On July 9, 2009, plaintiff was observed to have normal mood and affect, he made appropriate eye contact, he was alert and oriented times three, there was no evidence of psychosis or mania, and he expressed his feelings and thoughts appropriately (Tr. at 238).

On July 22, 2009, plaintiff saw the prison psychiatrist (Tr. at 237-238). Plaintiff stated that although his medication seemed to be working and he was calmer, he was still having problems with irritability and depressed mood. His diagnoses were the same. The doctor increased plaintiff's Zoloft[3] from 50 mg to 100 mg.

---

[3]This record reflects that plaintiff's Sertraline was increased -- Sertraline is the generic form of Zoloft.

On August 13, 2009, plaintiff reported doing well with his medication (Tr. at 238-239). He said his parents were getting older and his father had severe COPD and Alzheimer's. Plaintiff's diagnoses were the same.

On August 28, 2009, plaintiff reported that his medication continued to work well (Tr. at 241). He was observed to have a stable and appropriate mood and affect, his speech was normal, he made appropriate eye contact, his hygiene and grooming were adequate, he appeared calm and cooperative. He was able to express his thoughts and feelings appropriately. There was no evidence of psychosis or mania. He was assessed with mood disorder not otherwise specified "per psychiatrist." His GAF was 68.

On September 2, 2009, plaintiff saw the prison psychiatrist and reported that he was scheduled to graduate from the Missouri Sex Offender Program ("MOSOP") on September 18 and was having panic attacks thinking of everything negative that could happen to him (Tr. at 240-241). "He is not sure where he will be placed and whether he will have a good cellie [prison cell mate] or not." His diagnoses were the same.

On September 16, 2009, plaintiff reported that he was graduating from MOSOP in a week and was very anxious about his future placement in the prison (Tr. at 241-242). He was prescribed Mirtazapine (antidepressant, also known as Remeron) at bedtime to help him with sleep.

On September 30, 2009, plaintiff reported that he had graduate from MOSOP (Tr. at 242-243). "The changed environment has added some pressures because sex offenders are stigmatized in the general population and he is having a hard time sleeping. . . . His children are having problems. His daughter is mentally unstable and son is getting a divorce and that is also on his mind." His Mirtazapine was increased to 30 mg at bedtime.

On October 7, 2009, plaintiff reported he was doing OK, sleep and appetite were adequate (Tr. at 243-244). His mood and affect were normal, speech was normal, he made

appropriate eye contact, there was no evidence of psychosis or mania, he expressed his feelings and thoughts appropriately. He continued to be assessed with mood disorder not otherwise specified with a GAF of 68.

On October 16, 2009, plaintiff complained of low back pain radiating into his legs (Tr. at 283-286). He was referred for an x-ray and told to exercise.

On October 22, 2009, plaintiff had x-rays of his lumbar spine which showed "mild degenerative changes in the lumbar spine, but no acute bony injury visible." (Tr. at 295, 299). He also had a chest x-ray which was normal (Tr. at 298-299).

On October 23, 2009, an echocardiogram[4] was done (Tr. at 292-294). His ejection fraction was normal at 67%.[5]

On November 17, 2009, plaintiff indicated he was doing ok (Tr. at 247-248). His sleep and appetite were adequate. "He is stressing over his release and wanted numbers for SSI." His mood and affect were normal, speech was normal, eye contact was appropriate, he was alert and fully oriented, and there was no evidence of psychosis or mania. His GAF was 68.

---

[4]An echocardiogram uses sound waves to produce images of the heart. This commonly used test allows doctors to see how the heart is beating and pumping blood. The doctor can use the images from an echocardiogram to identify various abnormalities in the heart muscle and valves.

[5]"Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts. During each heartbeat cycle, the heart contracts and relaxes. When your heart contracts, it ejects blood from the two pumping chambers (ventricles). When your heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it doesn't empty all of the blood out of a ventricle. The term 'ejection fraction' refers to the percentage of blood that's pumped out of a filled ventricle with each heartbeat. The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal. An LV ejection fraction of 50 percent or lower is considered reduced. Experts vary in their opinion about an ejection fraction between 50 and 55 percent, and some would consider this a 'borderline' range."
http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286

On November 18, 2009, plaintiff reported increased stress and depression because he had not been contacted by the Parole Board (Tr. at 245-246). He had been working in the dining room and was having a lot of conflicts because other workers were not pulling their weight. His uncertainty about his future was causing him to worry and was interfering with his sleep. His Mirtazapine was increased to 45 mg at bedtime.

On December 4, 2009, during a mental health visit, plaintiff denied a history of suicidal ideation (Tr. at 249-250). His mood and affect were normal, speech was normal, eye contact was normal, he was alert and fully oriented, and there was no evidence of psychosis or mania. He reported his problems as "depressed mood when not on meds. Sleep problems." He was told to start exercising regularly and to take his medication as prescribed.

On December 9, 2009, plaintiff's Mirtazapine was discontinued due to complaints of muscle aches, and he was prescribed Trazodone in its place (Tr. at 248-249).

On December 23, 2009, plaintiff reported he was doing alright with Trazodone (Tr. at 250-251). He continued to work in the kitchen. He was "resentful due to his feeling that he has been discriminated as far as this release date is concerned. He says that other inmates with worse sentences and crimes have received an earlier release date after their completion of the MOSOP." His diagnoses remained the same and he was continued on his same medications.

Plaintiff's mental health appointments during the remainder of December 2009 and January 2010 reflected normal mental status exams, the same diagnoses and GAF scores of 70 (Tr. at 253-254).

Plaintiff filed his application for disability benefits on January 27, 2010, immediately upon his release from prison.

On February 16, 2010, plaintiff saw Barbara Martin, a social worker, after having been referred for mental health care by his parole officer (Tr. at 311-315). Plaintiff said he was "stuck in a low mood most of the time." He had been experiencing these symptoms, including

12

"drifting off to other places" since he was 7 or 8 years old. Plaintiff reported having been hospitalized at age 18 for considering suicide. He was not put on medication then. Plaintiff sated this was "not really a suicide attempt, but was just a threat after he had broken up with his girlfriend. . . . The client stated women are just objects to be used, but he did not want to be left." Plaintiff had not consumed alcohol or drugs since his imprisonment, but before that he would drink 18 to 36 beers a day along with a fifth of vodka. He drank daily. He experimented with marijuana, acid, Quaalude, methamphetamine, cocaine, Valium and PCP. Plaintiff was smoking a pack of cigarettes a day, down from 2 or 3 packs a day. Plaintiff indicated he is happy where he is living and is able to help his parents who are elderly. Plaintiff had already filed for disability and SSI immediately upon release from prison.

Ms. Martin conducted a mental status exam and observed that plaintiff "seemed to be depressed" and his mood and affect were flat. Ms. Martin noted that plaintiff often thought of what he was going to say for what reaction he would get. "The client seemed to wring his hands a lot throughout the interview. He seems to be thinking about what he says before he says it." Plaintiff reported hearing three voices. When asked what he wanted out of this treatment, he said he needs help "finding who he is." Plaintiff said he reads for relaxation and "has to always be doing something." He enjoyed hunting but cannot do that anymore due to his felony conviction. Ms. Martin assessed his weaknesses as "legal problems, financial problems, and low self-esteem." He was assessed with major depressive disorder, recurrent, severe with psychotic features; borderline personality disorder; severe chronic legal problems; severe chronic social problems, and a GAF of 38.[6]

---

[6]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

On February 18, 2010, plaintiff saw Henry Wisdom, D.O., for a psychiatric evaluation (Tr. at 309-310, 398-399). Plaintiff reported being depressed all the time, having mood swings, and suffering from a lack of concentration. He was taking Zoloft and Trazodone. Plaintiff reported smoking a half a pack of cigarettes per day and drinking "twenty to thirty cups of coffee per day." Plaintiff reported not sleeping well, getting five to seven hours of non-restful sleep at night. He described a typical day as getting up at 3 or 4 a.m., finding something to do, taking a nap around 10 or 11, then doing something such as laundry, dishes, or walking the dog. Dr. Wisdom noted that plaintiff "appeared to be in fairly decent physical shape." His overall mental status examination was normal. Dr. Wisdom started plaintiff on a small dose of Seroquel XL, a mood stabilizer.

On February 23, 2010, plaintiff telephoned Dr. Wisdom's office and said he was able to find a pharmacy to fill the Trazodone and Zoloft for $4 but not the Seroquel (Tr. at 428). He was told to "stop taking the Seroquel."

On February 26, 2010, Robin Smith, LPN, met with plaintiff in his home (Tr. at 430-431). "Client makes good eye contact, verbalizes well, overall appearance is good." Plaintiff reported compliance with medication and denied any side effects. Plaintiff said he had applied for SSDI and Medicaid but had not heard anything yet. "Client verbalized that he has been doing well. He gets up around 4-5 am and helps around the house. Client would like to receive some training maybe in taxidermy and discussion was held in regards to voc-rehab. Client speaks good about himself this day."

On March 3, 2010, plaintiff saw Barbara Martin, a licensed clinical social worker, for individual therapy (Tr. at 432-433). Plaintiff was upset when he arrived. "He had just found out he had been denied medicaid that morning. Client stated he had been crying over the decision and has felt very down all day. Client denies any thought of harming himself or

14

others. Client is concerned about his future and wanted reassurance that he would receive help from the program."

On March 8, 2010, Robin Smith spoke to plaintiff to schedule a home visit (Tr. at 434-435. Plaintiff "states that he is feeling somewhat bored, has been out working in the flower beds, however the mud is almost too much to get anything accomplished." Plaintiff expressed an interest in a referral to Voc-Rahab.

On March 9, 2010, plaintiff saw Dorothy Milburn, a nurse practitioner, for a general physical (Tr. at 340-343, 524-527). When discussing previous hospitalizations, he did not mention the psychiatric hospitalization at the age of 18 for a suicide attempt which he reported three weeks earlier to Barbara Martin. He reported being a recovering alcoholic with no alcohol the past five years. "Using marijuana and using cocaine." Plaintiff said he was not fasting and had used methamphetamine and cocaine. He reported anxiety, high irritability, emotional lability, and depression. He denied feeling tired or poorly. He reported chest discomfort, tightness or pressure lasting from 20 minutes to several days, worse by exertion but not relieved by rest. His cardiac exam was normal. His musculoskeletal exam was normal. Mental status exam was normal. His mood was euthymic (normal). He was assessed with arthritis, methamphetamine abuse, cocaine abuse, depression, and anxiety disorder not otherwise specified. Chest x-rays showed no evidence of acute cardiopulmonary process (Tr. at 349, 515). Ms. Milburn recommended blood work and an ECG.[7]

On March 12, 2010, Robin Smith visited plaintiff at his home (Tr. at 436-437). "Client makes good eye contact, verbalizes well, overall appearance is good." Plaintiff reported medication compliance and denied any side effects. "Client was upset this day as he states he

---

[7]An electrocardiogram (EKG or ECG) is a test that checks for problems with the electrical activity of the heart. An EKG translates the heart's electrical activity into line tracings on paper.

has had nothing but bad news this week." Plaintiff said that in addition to being denied Medicaid, his parole officer informed him that a day care was going in up the road a few blocks and that he would either have to move or go on house arrest. He said he had no where else to go except a halfway house and that is like going back to prison. He was angry about having paid his dues to society with prison time and referred to this house arrest as a "low blow." Ms. Smith provided a referral to vocational rehabilitation, and plaintiff reported that he had updated his information on his application for Social Security disability benefits.

On March 17, 2010, plaintiff saw Barbara Martin for individual therapy (Tr. at 438-439). Plaintiff complained about having to be on house arrest because of the day care down the street from his home. He reported medication compliance and said that "his medication seems to be helping him to be less depressed."

On March 18, 2010, plaintiff saw Dr. Wisdom for a follow up (Tr. at 400). "Apparently he has not been doing very well taking just the Trazodone and Zoloft by itself. We knew he was going to require something stronger, but for the time being we were hoping we could get by until he got his Medicaid." Dr. Wisdom prescribed Haloperidol[8] and told him to come back in a month. "If he appears to be doing well on these three medications, then when the time comes we can switch him over to Seroquel." Samples of Seroquel[9] were provided.

On March 19, 2010, Robin Smith visited plaintiff at his home (Tr. at 440-441). "Client makes good eye contact, verbalizes well, overall appearance is good." Ms. Smith helped plaintiff complete the paperwork for a Medicaid hearing. She also sent a referral to vocational rehabilitation. Plaintiff reported medication compliance and denied any side effects. Plaintiff said he had used oxygen the night before and felt better this morning. He planned to have a

---

[8]Also called Haldol, this drug treats mental illness such as schizophrenia, behavior problems, and agitation.

[9]Treats schizophrenia, bipolar disorder, and depression.

16

sleep study done once Medicaid was awarded. Plaintiff was worried that he would not be able to work in the garden and mow the yard, which he looked forward to, due to being on house arrest.

On March 31, 2010, plaintiff saw Barbara Martin for individual therapy (Tr. at 442-443). "Client came to office appearing in a good mood." Plaintiff was allowed to leave his home for appointments and for four hours on Saturdays. "He has recently had medications changed to Haldol and stated he feels good."

On April 1, 2010, Robin Smith met plaintiff at his home (Tr. at 444-445). "Client makes good eye contact, verbalizes well, overall appearance is good." Plaintiff reported medication compliance but said his medication may be making his jaw tight. "He states that something must be working for him as he is feeling better mentally. . . . Client continues to be positive focused even with being on house arrest." He said he was going to take a lie detector test so he could get more than 4 hours out of his home on Saturdays. Plaintiff reported keeping busy around the house helping his parents.

On April 9, 2010, Robin Smith met plaintiff at his home (Tr. at 446-447). "Client makes good eye contact, verbalizes well, overall appearance is good." Plaintiff reported medication compliance but had the side effect of "very wet mouth" and back spasms. He had started taking thyroid medication. "He does help his elderly parents out daily. . . . He maintains a positive focus." Plaintiff had been doing some reading, and was gearing up to do gardening and yard work. He had an appointment with vocational rehabilitation the following week.

On April 12, 2010, Lester Bland, Psy.D., completed a Psychiatric Review Technique finding that plaintiff's mental impairment is not severe (Tr. at 316-326). He found that plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and no difficulties in maintaining concentration, persistence or pace.

17

On April 13, 2010, Robin Smith spoke to plaintiff who indicated he had been awarded Medicaid (Tr. at 448-449).

On April 14, 2010, plaintiff saw Dr. Wisdom (Tr. at 401). "He continues to show progress. He is working with a counselor, and we are seeing some more positive signs from him along with the medications he is taking." Dr. Wisdom kept plaintiff's medications the same. That same day plaintiff met with Barbara Martin for individual therapy (Tr. at 450-451). Plaintiff had been awarded more time out of his home during the weekends. He said he had not adjusted to being out of prison yet and had had a hard time finding things to keep him active. His parents were in poor physical health and he was taking care of them. He was walking more and planned to hunt mushrooms over the weekend.

On April 15, 2010, Robin Smith spoke to plaintiff on the phone (Tr. at 452-453). Plaintiff said he had received a letter from Disability Determinations denying his application for Social Security disability benefits.

On April 20, 2010, plaintiff called Barbara Martin (Tr. at 454-455). He was "in distress about present situation." Plaintiff said the coping skills were not working and he was "a mess." Ms. Martin spoke to Dr. Wisdom who instructed her to tell plaintiff to increase his medication dosage. She tried to call plaintiff but was unable to reach him.

On April 21, 2010, Robin Smith had a meeting with Barbara Martin (Tr. at 456-457). They discussed that since being awarded Medicaid plaintiff had been taking off Haldol and put back on Seroquel "however the client's dosage needed to be adjusted as he was being delusional and having a racing mind." This was apparently in reference to plaintiff's call the day before as no specific delusions were described in this record.

On April 23, 2010, Robin Smith met plaintiff at his home (Tr. at 458-459). Plaintiff made good eye contact, verbalized well, and his overall appearance was good. "Client is hyper acting this day and complains of a racing mind." Plaintiff stated that his racing mind had

18

improved somewhat since Dr. Wisdom increased his dosage of Seroquel. Plaintiff denied delusions. "He got a letter that he was denied his SSDI and we discussed options of appeal and attorneys. He decided that he would like to have representation and he called Burnett & Driskell this day and lined up a consultation appointment as well, with assist of this worker. Client states he feels fairly positive about his life as knew he would be denied his disability, but he is glad that he did get his Medicaid and feels that the assist[ance] of this worker helped with the appeal and got the hearing thrown out." Plaintiff continued to take care of his elderly parents, and he had an upcoming appointment with vocational rehabilitation.

On April 28, 2010, plaintiff canceled his appointment with Dr. Wisdom (Tr. at 420). He did show up for his therapy appointment with Barbara Martin, however (Tr. at 462-463). He reported an inability to concentrate. "Client was concerned because he did not complete one task outside before starting another and forgot to put watering can away."

On May 6, 2010, plaintiff had a colonoscopy (Tr. at 351-352, 370-381, 567-570). When asked about his past medical history, plaintiff reported personality disorder, depression, high cholesterol and hypertension. He did not mention arthritis, back pain, joint pain. He reported smoking 2 packs of cigarettes per day and drinking 36 cups of coffee per day. His physical exam revealed a regular cardiac rhythm without murmurs, rubs or gallops. He weighed 228 pounds. The colonoscopy was normal and he was told to come back in 5 years.

On May 12, 2010, plaintiff saw Dr. Wisdom (Tr. at 402). Plaintiff reported sleeping well. Dr. Wisdom noted that plaintiff "has done extremely well on this combination of medications" which were Trazodone ad Seroquel. He also saw Barbara Martin this day (Tr. at 466-467). Plaintiff reported doing better.

On May 13, 2010, plaintiff saw Clarence Leach, a counselor (Tr. at 408-412). Plaintiff reported his goals of treatment as follows: "I would like to know what, how, and why I do what I do the way I do it. I need help finding who I am." Obstacles were legal, financial and

19

low self-esteem.  This record repeated and referred to the February 16, 2010, diagnoses of Barbara Martin including the GAF of 38.

Plaintiff told Mr. Leach that his problem was "I am currently on parole."  His goals were, "I want to be successful to complete my parole and not return to the DOC [Department of Corrections]."

On May 19, 2010,  Robin Smith met with plaintiff at his home (Tr. at 468-469). Plaintiff made good eye contact, was able to verbalize well, and his overall appearance was good but fidgety.  "Client has done a great job at completing 90% of the paperwork that he is to have prepared for the disability attorney  next week.  Client has a very positive outlook of his work as well.  Client states he has a positive outlook and that he will be getting off of house arrest as well."  Ms. Smith helped plaintiff complete the rest of the paperwork for his appointment with a disability lawyer and discussed plaintiff's caffeine intake and how that can cause him to feel "jittery."

On May 25, 2010, Robin Smith drove plaintiff to a meeting with his disability lawyer to initiate the appeal process (Tr. at 470-471).  Plaintiff had been taken off house arrest.  Ms. Smith observed some anxiety while plaintiff was going over all the paperwork with the lawyer. She observed that plaintiff appeared to understand everything and in fact had said that he understood everything.  Plaintiff needed to get coffee and smoke a cigarette after the meeting. On the way home Ms. Smith again talked to him about how his caffeine intake can affect his mental illness signs and symptoms.

The next day, on May 26, 2010, plaintiff saw Barbara Martin for individual therapy (Tr. at 473-474).  On this day he reported "starting to remember many things from his past abuse. . . .  He did state he hears voices at times which laugh at him."

On June 1, 2010, plaintiff saw Dorothy Milburn, a nurse practitioner, and reported a lot of morning pain in his low back and all of his joints (Tr. at 336-338, 520-522).  Plaintiff

denied feeling tired or poorly; he denied chest pain, discomfort or palpitations. His list of previous hospitalizations did not include a psychiatric hospitalization at age 18 for a suicide attempt. He reported "using marijuana and using cocaine." His psychological review of symptoms reads, "No depression." (Tr. at 337). His mood was euthymic (normal). "No feelings of hopelessness, depression, or feeling down. No loss of interest in activities, little interest, or pleasure in doing things." His physical exam, including his cardiac exam, were normal. He had tenderness to palpation in his lumbar spine, muscle spasms in his lumbosacral spine, pain in the lumbosacral spine elicited by motion. He had normal range of motion in his lumbar spine. Ms. Milburn assessed arthritis and backache. X-rays of plaintiff's lumbar spine showed lower lumbar spondylosis[10] and degenerative facet disease with no evidence of acute fracture (Tr. at 514). She recommended Relafen (non-steroidal anti-inflammatory); she told him to do light range of motion exercises and to alternate heat and ice.

On June 9, 2010, plaintiff saw Dr. Wisdom (Tr. at 403). "He said he is doing quite well on the Seroquel" and when he uses oxygen "he feels so much better." Dr. Wisdom observed that plaintiff's mood and affect "look good. No reason to make any changes."

On June 10, 2010, Robin Smith met with plaintiff at his home (Tr. at 477-478). She observed that plaintiff made good eye contact, was able to verbalize well, his overall appearance was good. He said he had never clenched his jaw before taking Haldol, and now that the Haldol had been stopped he continued to clench his jaw. He denied any other side effects. His "racing mind" had improved. Plaintiff had been spending his time gardening. He reported stress in taking care of his elderly parents. Plaintiff described trouble focusing: "States he can sit out on the porch and drink coffee and smoke cigarettes and if someone will ask him what he has been thinking about, he cannot tell you as he does not remember."

---

[10]Osteoarthritis, or any other form of degeneration, of the spine.

21

Plaintiff was concerned about an upcoming lie detector test.

On June 22, 2010, plaintiff had an evaluation for a sleep study (Tr. at 334-336, 517-519). Plaintiff said when he does not use oxygen he feels tired all the time, he stops breathing in his sleep and he snores. "No chest pain or discomfort and no palpitations." Plaintiff was asked about previous hospitalizations but did not mention a hospitalization due to suicide attempt at age 18 as he had reported a few months earlier to Ms. Martin. He reported being a recovering alcoholic with no alcohol consumption in the past 5 years, but "using marijuana and using cocaine." Psychological symptoms were reviewed: "No anxiety." Plaintiff did not report hearing voices or being depressed. His mood was euthymic (normal). His cardiac exam was normal.

On June 24, 2010, plaintiff saw Barbara Martin for individual therapy (Tr. at 479-480) He was upset about continuous arguing between his mother and father "Client's parents are both in poor health and client does most of the housework and helps his parents where needed." Plaintiff said their arguing seemed to be triggering past memories of his abusive childhood. That same day he met with Robin Smith and reported having continued working in the garden (Tr. at 481-482). He was looking forward to job training the next day and was hoping it would turn into a part time job. He said he really needed time away from his parents.

On June 30, 2010, the sleep study was conducted by Scott Eveloff, M.D. (Tr. at 353-354, 358-359). The doctor recommended weight loss, avoiding central nervous system depressants including avoidance of alcohol in the evening. Further evaluation of periodic limb movements was recommended. Plaintiff's low oxygen saturation during sleep resulted in a recommendation of supplemental oxygen. Weight loss was recommended "as an additional important treatment option." On the day of the sleep study, plaintiff weighed 241 pounds. Plaintiff was also told to avoid central nervous system depressants. "This includes avoidance of

alcohol in the evening."

On July 7, 2010, plaintiff saw Dr. Wisdom (Tr. at 404). "No problem with his medication at the present time. His affect and mood looks good. He is sleeping well, eating well, and showing no problems as far as his medications are concerned."

On July 8, 2010, plaintiff met with Barbara Martin and Robin Smith (Tr. at 483-486). Plaintiff said he had undergone job training as a dishwasher at Country Kitchen and liked it. He said there was a job opening for 15 hours and he "really would like to give that a try." Robin Smith talked to plaintiff about the drama he tries to create, such as his referring to her having put him on the bottom of the ladder because she did not immediately give him paperwork for lab orders. Ms. Smith recommended plaintiff continue to make attempts at getting the job at Country Kitchen.

On July 22, 2010, plaintiff saw Theodore Rights, M.D. (Tr. at 393-394). "[H]e has been treated by Dr. Wisdom for psychiatric problems which include major depression disorder with severe psychotic features and borderline personality disorder. He is stable on his current medication and seem actually in my opinion to be doing very well." Plaintiff reported using oxygen at night time, but it was not clear to Dr. Rights whether plaintiff was using a CPAP[11] or BiPAP[12] machine. "I think it is just the oxygen and I am not sure quite why it is working out that way." Plaintiff weighed 241.8 pounds. Plaintiff's primary complaint was for a condition unrelated to his allegedly disabling impairment.

---

[11]The CPAP machine delivers a predetermined level of pressure. It releases a stream of compressed air through a hose to the nose mask and keeps the upper airway open under continuous air pressure. This air pressure prevents obstructive sleep apnea, which occurs as a result of narrowing of the airway due to the relaxation of upper respiratory tract muscles during sleep. This machine helps to increase the oxygen flow by keeping the airway open.

[12]BiPAP, a non invasive ventilation machine delivers two levels of pressure. Inspiratory Positive Airway Pressure (IPAP) is a high amount of pressure, applied when the patient inhales and a low Expiratory Positive Airway Pressure (EPAP) during exhalation.

23

Later that day plaintiff met with Robin Smith (Tr. at 487-488). She again talked to him about decreasing his caffeine intake after he complained about the heat and dehydration. He reported not getting the job at Country Kitchen because of his criminal record as a sex offender. He also had been reprimanded for being alone with his nephew and his nephew's friend which was against the terms of his parole. He was angry about this because the three of them were on the porch shooting off fireworks and he did not consider this being "alone" with them. He completed his polygraph but did not know the results yet and it had cost $285. "Client states his emotions have been up and down. And taking care of his parents is like walking on egg shells some days." He said he really wanted a part-time job to get him out of the house for a while.

He also met with Barbara Martin on this day (Tr. at 489-490). He told her he did not get the dishwasher job because of his sex conviction. "Client has been turned down by an employer after he learned about the sex offence. Community Options was very sure he had the job until the offence was learned by employer." Ms. Martin recommended plaintiff do a biography of his childhood in the hopes of revealing "unremembered memories."

On August 4, 2010, plaintiff saw Dr. Wisdom and reported problems sleeping (Tr. at 405). Dr. Wisdom increased plaintiff's dose of Seroquel.

On August 5, 2010, Robin Smith met with plaintiff at his home (Tr. at 493-494). Plaintiff complained about his parents -- they griped at him when he did all the housework and continued griping even after he had backed off. "I am trapped here until I get my disability." His parents did not want him driving their car but they complained about having to drive him everywhere. All of this was causing his mind to race and he felt like he was on a roller coaster. Plaintiff was still "put out" by not getting the dishwasher job because of his conviction and he indicated he was going to look for work in another town. He was also "put out" about being reported for being on his porch with two minors. He said he needed to leave

24

this small town to survive. He said his mind was not racing as much after being able to vent with Ms. Smith, and he denied homicidal and suicidal ideation.

On August 12, 2010, Robin Smith met with plaintiff whom she described as having good eye contact, was able to verbalize clearly, and his overall appearance was good (Tr. at 498-499). Plaintiff denied any medication side effects. "Client continues to take care of his elderly parents and he talks about this in detail, the ups and downs, the pros and cons. Client states he has come to the conclusion that if he gets financially secured that he will move into a place of his own, but not too far from his folks". Plaintiff continued to try to find part-time work.

On August 19, 2010, plaintiff had an echocardiogram done by Laeeq Azmat, M.D. (Tr. at 389-390). Plaintiff weighed 244 pounds. Dr. Azmat found that plaintiff had normal left ventricular size and systolic function with a normal ejection fraction. No regional wall motion abnormalities were noted. No diastolic dysfunction was noted. The left atrium was mildly dilated.

On August 26, 2010, plaintiff met with Barbara Martin (Tr. at 502-503). He continued to take care of his parents.

On September 1, 2010, plaintiff saw Dr. Wisdom (Tr. at 406). "He has done very well on the Seroquel XR 300 mg. I don't plan to make any changes and we will continue with this."

On September 8, 2010, plaintiff saw Sam Barton, D.O., who recommended that plaintiff stop smoking (Tr. at 593).

On September 9, 2010, plaintiff canceled his appointment with Barbara Martin for psychotherapy (Tr. at 425-426, 504-505). He said he had had surgery to remove a cyst that morning and was not up to coming in. "Client stated otherwise he was doing well."

On September 23, 2010, Robin Smith met with plaintiff who continued to deny medication side effects (Tr. at 506-507). He reported continued racing thoughts. He was still

facing the difficulty of finding work with being on the sex offender list. Plaintiff continued to care for his parents. He was scheduled to get his driver's license on October 1 but his parents were not OK with this. They discussed plaintiff's physical health and he denied any problems. He said he gets up early in the morning and sits outside drinking coffee and he works in the garage. Plaintiff said he had not heard anything yet with respect to his disability case. Ms. Smith recommended he continue looking for work. Plaintiff also met with Barbara Martin for individual therapy on this day (Tr. at 508-509). He expressed worry over what would happen to him if something happens to his parents who are in progressively failing health. Ms. Martin recommended he talk to his siblings about that. Plaintiff said he was depressed about not being able to get a job because of his sex offender status.

On September 29, 2010, plaintiff saw Dr. Wisdom (Tr. at 407). Plaintiff had no complaints and for some unknown reason, Dr. Wisdom increased plaintiff's Seroquel to 400 mg. "I think he has done satisfactory with it." Plaintiff also spoke to Robin Smith on this day (Tr. at 510-511). The entire conversation was about plaintiff's disability case. "Encouraged the client not to get his hopes set too high on his disability determinations".

On October 14, 2010, plaintiff saw Barbara Martin (Tr. at 643-644). Plaintiff said he was stressed about his parents becoming unable to take care of themselves. Plaintiff was caring for them and cleaning up after them. "Client has not found a job and feels worthless at times because of his situation. He is unable to find work due to his charges."

On October 27, 2010, plaintiff complained of wheezing and wanted to talk about getting an inhaler (Tr. at 624-625). He reported having used his mother's Albuterol and his symptoms greatly improved. Plaintiff continued to smoke, and he used oxygen at night. Plaintiff weighed 261.2 pounds. He had normal range of motion in all extremities, his gait was steady, his psychological exam was normal. His oxygen saturation was 94% on room air. He was assessed with early chronic obstructive pulmonary disease ("COPD") and tobacco

26

dependence. He was told to stop smoking and was given a prescription for ProAir inhaler. On that day he also saw Dr. Wisdom and said he did not think his Seroquel was working very well (Tr. at 635). Dr. Wisdom disagreed. "I think that doesn't need to be changed." He did, however, increase plaintiff's dose of Trazodone. "I think this is all the medication we are going to be changing on him, and psychotherapy should proceed in earnest."

On October 28, 2010, plaintiff called his case manager to cancel an appointment "as client's daughter had overdosed and client was with his daughter at the hospital." (Tr. at 645-646). Plaintiff reported medication compliance and denied any side effects. Later that day plaintiff did have a therapy session with Barbara Martin (Tr. at 647-648). "Client came to office in fairly good humor. . . . Client is experiencing anxiety about his parents and their ability to care for themselves. Client is taking care of them to the best of his ability. He lives with them and tries to keep house and daily chores. . . . . Client has not obtained a job but it doesn't appear he can take care of his parents and have a job at this time."

On October 29, 2010, plaintiff was seen at Cameron Regional Medical Center for a condition unrelated to his allegedly disabling impairments (Tr. at 584). The doctor recommended plaintiff stop smoking. He denied chest pain or palpitations.

On November 4, 2010, plaintiff's case worker, Kristie Luper, met with plaintiff (Tr. at 649-650). Plaintiff reported getting healthy amounts of sleep and having no medication side effects. He denied getting regular exercise but said he was trying to eat healthy.

On November 9, 2010, plaintiff saw Dr. Wisdom who wrote, "He has done extremely well and there are no problems with his medications." (Tr. at 636).

On November 11, 2010, plaintiff saw Barbara Martin for individual psychotherapy (Tr. at 651-652). He was somewhat depressed and said he had been experiencing stress due to recent surgery and his parents' health. "Client is also caring for his elderly parents. They are at the stage that they are just now starting to give up their independence. Client is having to do

27

more for them. He stated he is worried to leave them by themselves at times."

On November 18, 2010, plaintiff called Kristie Luper to cancel an appointment due to his daughter's hospitalization (Tr. at 657-658).

On November 22, 2010, Kristie Luper telephoned plaintiff to schedule an appointment (Tr. at 659-660). A date was not scheduled due to plaintiff's busy schedule.

On November 24, 2010, plaintiff saw Barbara Martin for individual psychotherapy (Tr. at 661-662). "Client is upset about his daughter this day. She is in the hospital for emotional problems and attempted suicide. His daughter was staying with him at the time. The daughter took [an] overdose of her medications. . . . Client seems to be overwhelmed at times with his aging parents and his daughter."

On November 29, 2010, Kristie Luper telephoned plaintiff to set up an appointment (Tr. at 663-664). He said his daughter was still in the hospital and would not be released until they could set her up with some services. He said she is on a lot of medication and acts like a small child which worries him. He reported his own medication compliance, no medication side effects, and no difficulty sleeping.

On December 9, 2010, plaintiff talked to Kristie Luper on the telephone (Tr. at 669-670). Plaintiff reported that his parents were frustrated at having plaintiff and his daughter living with them. Later that day plaintiff saw Barbara Martin for individual psychotherapy (Tr. at 667-668). "Client came to office overwhelmed with his current situation, client's daughter is now living with him in his parents' home. His daughter tried to commit suicide recently and was just released from hospital few days earlier. Client stated he does not know how to be a father. . . . Client is also trying to help his parents who are older and have many health problems."

On December 15, 2010, plaintiff saw Dr. Wisdom who wrote, "Michael has done fairly well. He stated that the Seroquel is working good for him and we don't need to make any

changes." (Tr. at 637).

On December 17, 2010, plaintiff saw Kristie Luper (Tr. at 671-672). Plaintiff reported having a calendar full of appointments for him, his parents and his daughter. Plaintiff said he is responsible for taking his parents to their appointments. He reported getting healthy amounts of sleep. He was not getting regular exercise but was staying active. He reported being "on the go quite a bit." "The client feels like he is doing pretty well mentally at this time. The client reports this does come and go, and he does have his bad days."

On December 28, 2010, plaintiff saw Kristie Luper (Tr. at 673-674). Plaintiff and his daughter had gone to Green Hills Community Action Agency to see if they could get assistance for housing. Plaintiff denied having any reason to see his primary care physician at this time. He denied medication side effects. "Client reports that he had been sleeping good. Client reports that his medication works really good to shut down his racing thoughts and help his mind to shut down so that he can go to sleep." Plaintiff said he was not doing any exercise but he "stays fairly active around the house and getting everyone in the family to their appointments." Plaintiff reported that he does most of the cooking.

On January 7, 2011, plaintiff spoke with Kristie Luper and said he had been sleeping well, he denied exercising but said he had been active, and he said he does most of the cooking. "Client reports that his parents have been hinting around that they want client and his daughter out of the house. Client doesn't have the money to get out and his daughter is unable to work. They have both filed for disability but don't have their money yet and have nowhere to go at this time." (Tr. at 675-676).

On January 12, 2011, plaintiff saw Dr. Wisdom who wrote, "He listed a few negative things he had going, but I think the medication is working. He was able to vocalize."

On January 13, 2011, plaintiff saw Barbara Martin for individual psychotherapy (Tr. at 677-678). "Client came to office overwhelmed with his situation at home. He is living with

his elderly sick parents and his twenty two year old daughter who is experiencing emotional problems."

On January 20, 2011, plaintiff called Kristie Luper to cancel his appointment due to having to take his parents to an appointment (Tr. at 679-680). Plaintiff reported taking his medication as directed, no adverse medication side effects, and "he is doing good at this time."

On January 24, 2011, plaintiff called Kristie Luper, he was anxious and talking fast, having to stop and take deep breaths a couple times during the conversation (Tr. at 681-682). Plaintiff's daughter got approved for disability but had "outlandish dreams" given the amount of money she would be receiving. She wants to move into her own apartment and get a car. She got upset with him when he cautioned her that she did not have enough money to do these things. He said his daughter needs to know how much it will really cost her to live in an apartment even if it were income based. He said he is afraid for his daughter because she has never lived on her own and does not know how to budget money.

On January 27, 2011, plaintiff met with Kristie Luper (Tr. at 683-684). She noted that he was appropriately dressed and appeared to be in a good mood. Plaintiff said his psychiatrist was not needing to change his medication, he was taking it as directed, and he had no adverse side effects. He reported no trouble sleeping. Plaintiff reported having to take someone to an appointment almost every day. He was helping his daughter buy furniture to store in the basement until she was ready to move into her own apartment. That same day he also met with Barbara Martin for individual psychotherapy (Tr. at 686-687). "Client is under extreme stress with his family. His parents are failing and becoming more forgetful. Client stated he knows now they cannot take care of themselves and he will have to stay with them. Client is becoming more aware of how at the present time he cannot change his living situation."

On February 9, 2011, plaintiff saw Dr. Wisdom who wrote, "He is doing very well. No problems with his medication." (Tr. at 639).

30

On February 10, 2011, plaintiff complained of off-and-on dizzy spells (Tr. at 620-622). Plaintiff was taking only Naproxen (non-steroidal anti-inflammatory) for back pain. He weighed 259.2 pounds. A cardiac consult with Arvind Sharma, M.D., was scheduled.

On February 17, 2011, plaintiff had an arterial doppler of his legs which showed mild arterial occlusive disease (blockage) of the left leg, moderate hardening of the arteries in the left leg, mild narrowing of the deep profunda artery[13] (581-582).

On February 22, 2011, plaintiff met with Barbara Martin and expressed being depressed over possibly needing surgery for blockages (Tr. at 690).

On February 23, 2011, plaintiff saw Arvind Sharma, M.D., for a consult on cardiomyopathy[14] (Tr. at 549-552, 614-617). Plaintiff weighed 254 pounds. "He presents to me for what is said to be cardiomyopathy for evaluation, but really his main symptoms are chest pressure." Plaintiff reported peripheral vascular disease but "the rest of the review of systems is negative at this time." Dr. Sharma observed that plaintiff was pleasant and in no acute distress. He recommended increasing plaintiff's aspirin to 325 mg daily, he prescribed nitroglycerin to be taken as needed for chest pain, and he scheduled a chemical stress test.

On February 24, 2011, plaintiff met with Barbara Martin and again described his stress due to his situation at home (Tr. at 692-693). He said his parents are aging and are hard to get along with. "He is becoming desperate and wants to move. Client's current situation does not allow for client to leave current residence. Due to his charge he cannot be homeless or obtain housing. If client becomes homeless he will be violated by his PO and will return to prison."

_____

[13]Also called the femoral artery, this is a large artery in the thigh that provides oxygenated blood to the tissues of the leg.

[14]Cardiomyopathy is a disease of abnormal heart muscle. There are three main types of cardiomyopathy -- dilated, hypertrophic and restrictive. Cardiomyopathy makes it harder for the heart to pump and deliver blood to the rest of the body.

31

On March 2, 2011, plaintiff saw Kristie Luper (Tr. at 694-695). He had spoken with his parole officer about his situation and the officer said he could not do anything to help plaintiff. Plaintiff stated that he planned to move out: "Client reports that he would rather go back to prison than live with his parents." He had a cardiac stress test scheduled and he anticipated he would do poorly on it because he "spends all day worked up due to his parents and everything that is going on." Plaintiff was also worried about becoming homeless. Ms. Luper made many phone calls trying to find some place where plaintiff could live; however, due to his status as a sex offender and with him being on parole, she was not able to come up with a solution. She called plaintiff back and said his therapist would talk to his parole officer and then discuss it with plaintiff. He responded that he does not want to discuss this topic anymore until after his stress test because he is "already severely stressed out."

On March 9, 2011, plaintiff saw Dr. Wisdom who wrote, "He has done very well. . . . His only concern seems to be his current relationship at home and with his kid. . . . As far as his medications, we elected not to make any change. The Trazodone, Seroquel XR, and Zoloft combination will be continued."

On March 10, 2011, Kristie Luper met with plaintiff at his home (Tr. at 697-699). Plaintiff again reported no difficulty sleeping and no medication side effects. He was not exercising but was constantly on the go. Plaintiff was doing all of the cooking and was looking forward to putting a garden in once spring arrived. He said he planned to stay with his parents. He said his mother had just been having an episode and plaintiff realized there was nowhere in Missouri he could go because of his sex offense. He said he knows he has to tough it out and find a way to deal with the stress when his mother goes on one of her rampages. Plaintiff reported complete compliance with all parole requirements and had postponed his cardiac stress test.

That same day plaintiff saw Barbara Martin for individual psychotherapy (Tr. at 700-701). He told her that his parents had kicked him and his daughter out. Plaintiff was unable to find any place to go due to his sex offender status. Plaintiff said later his parents denied having forced him to leave. He was accepting the fact that they need him and he needs them.

On March 16, 2011, plaintiff saw Dr. Sharma for a Lexiscan Cardiolite study (chemical stress test) which showed a small area of moderate intensity basal inferior wall ischemia (damage to heart muscle due to reduced supply of oxygen) and mild left ventricular systolic dysfunction (Tr. at 547-548).

On March 23, 2011, plaintiff saw Dr. Sharma for a follow up on chest pain (Tr. at 540-541, 774-775). Plaintiff said that since his last visit he had taken nitroglycerin 5 times. If he does not take it, his chest pain lasts 15-45 minutes. When he does take it, he gets relief within about 5 minutes. Dr. Sharma recommended cardiac catheterization.[15]

On March 24, 2011, plaintiff met with Kristie Luper (Tr. at 702-703). Plaintiff said he was trying to stop smoking. He reported no difficulty sleeping. He was worried about his cardiac situation and said he knew he would have to start exercising. He had a reevaluation for Medicaid and was worried about his benefits being cut because his disability had not yet been awarded. Ms. Luper told him if his Medicaid is cut he should reapply because he needs to get his heart problems resolved. He also saw Barbara Martin on this day and said he had basically resolved his difficulties with his parents and had accepted his current living situation (Tr. at 704-705).

---

[15]Cardiac catheterization is a procedure used to diagnose and treat cardiovascular conditions. During cardiac catheterization, a long thin tube called a catheter is inserted in an artery or vein in the groin, neck or arm and threaded through the blood vessels to the heart. Using this catheter, doctors can then do diagnostic tests as part of a cardiac catheterization. Some heart disease treatments, such as coronary angioplasty, also are done using cardiac catheterization.

33

From March 28, 2011, through March 29, 2011, plaintiff was at Heartland Health undergoing a cardiac catheterization with stent placement performed by Arvind Sharma, M.D. (Tr. at 533-534, 776-777). He was discharged in stable condition. Dr. Sharma noted that plaintiff tolerated the procedure well with no complications and he could increase his activities as tolerated.

On April 6, 2011, plaintiff saw Dr. Wisdom who wrote, "He has done extremely well on his medications. We will continue to see him on a monthly basis. We did hear he is no longer in the program for the Department of Corrections, so I think the next time we see him we will start extending the time between visits. Meanwhile, I feel his medication is quite stable at the present time."

On April 7, 2011, plaintiff told Kristie Luper he was trying to exercise daily by taking his dogs for a walk two or three times a day (Tr. at 706-707). Plaintiff said he was not able to walk very far because he was out of shape but he was trying to increase his exercise daily and eat healthy foods.

On April 27, 2011, plaintiff saw Dr. Sharma for a follow up (Tr. at 536-538). "He has ben doing well." Plaintiff reported having only two minor episodes of chest discomfort which were resolved with nitroglycerin. Plaintiff's cardiovascular exam was normal. His lungs were normal. He was continued on his same medications.

On April 28, 2011, plaintiff met with Barbara Martin (Tr. at 631-634). Plaintiff made good eye contact and his mannerisms were good. Plaintiff reported hearing voices which "repeat negative cognitions to him." He sees shadows of things which follow him and spy on him. He goes from manic phases to depressive phases, he has thoughts of suicide. He reported having been hospitalized for suicide attempt at age 18. Plaintiff was able to care for his own personal hygiene unassisted. "He does think of suicide frequently but has no plans. Client stated he had a plan of a slow death by drinking and using drugs. He stated 'I want to live

34

now.'" Plaintiff does most of the shopping and cooking for his parents who are elderly and

need help. He does most of the cleaning and at times becomes overwhelmed due to his parents'

clutter. "Client does not work due to his physical problems. He has been referred to Voc-

Rehab in the past but [was] unable to participate due to physical problems." Plaintiff said he

likes to work outside in the yard and take care of flowers. Ms. Martin noted that although

plaintiff's mental health had improved, his physical health had declined and therefore his

functioning level has remained the same. His Axis I through V diagnoses remained the same as

they had on every visit since his initial one with this office.

During May and June 2011, plaintiff participated in cardiac rehab during which he

walked on treadmills and used other exercise equipment (Tr. at 558-566, 899-913). On a

June 6, 2011, visit he weighed 259 pounds (Tr. at 556). He also continued to see Kristie Luper

and Barbara Martin during this time and express his worry over Medicaid, getting disability,

juggling everything he had to do to take care of himself and his parents. He continued to try to

increase his exercise and eat healthier (Tr. at 731-727). He said he had no difficulty doing

things with his upper body but struggled to do things with his legs (Tr. at 723). He was

receiving medical treatment for that problem (Tr. at 723). He was having a lot of difficulty

with smoking cessation (Tr. at 723). Plaintiff continued to sleep well as long as he used his

oxygen at night (Tr. at 727).

Meanwhile, on May 4, 2011, plaintiff saw Dr. Wisdom (Tr. at 642). "He seems full of

energy and it was reported his progress has been good. We have been working with his family

and this has made a big difference for him in his life. No changes will be made in his

medications."

On May 12, 2011, plaintiff saw Barbara Martin (Tr. at 909-910). She noted that he

seemed to be sad and slightly depressed. He had been going to cardiac rehab and other

appointments and felt overwhelmed. He talked about his weekly sex offender meetings.

Plaintiff had become complacent with the situation at home and said he was anxious about his upcoming appointment about his legs. "He shows to be somewhat stable at this time."

On June 8, 2011, plaintiff had an arterial doppler study[16] done on his legs which showed mild diffuse atherosclerotic changes (hardening of the arteries) to the right leg with no inflow disease and no significant stenosis (narrowing) and diffuse calcific atherosclerosis on the left with no inflow disease and no areas of high grade stenosis (Tr. at 574-575). He did have mild occlusion (blockage) of the proximal to mid superficial femoral artery[17] with reduced flow.

On June 17, 2011, plaintiff saw Matthew Lukens, M.D., for a follow up on left leg claudication (Tr. at 606-607, 737-743). "We tried conservatively with exercise and he had undergone a cardiac stent since that time and was exercising daily". Plaintiff continued to have difficulty, however, due to his left leg claudication. Plaintiff underwent an abdominal aortogram with bilateral lower extremity runoff[18] (Tr. at 603-605, 744-746). This test

---

[16]A Doppler ultrasound is a noninvasive test that can be used to estimate your blood flow through blood vessels by bouncing high-frequency sound waves (ultrasound) off circulating red blood cells. A regular ultrasound uses sound waves to produce images, but cannot show blood flow.

[17]The femoral artery is a large artery in the thigh that provides oxygenated blood to the tissues of the leg.

[18]Abdominal aortograms with runoff are arteriograms of the lower abdominal aorta and arteries in the legs. The doctor will thread a narrow, flexible plastic tube, called a catheter, through the arteries suspected of having the narrowing or blockage. The tube will be hooked to a pump that injects X-ray dye. Once the X-ray pictures show where the blockages are, the doctor will be able to tell the best way to open the blocked blood vessels.

showed blocked left superficial femoral artery,[19] right common iliac aneurysm, moderate right superficial femoral artery disease, and severe tibial disease.

On June 21, 2011, plaintiff had a CT angiography[20] of his pelvis and abdomen (Tr. at 601-602, 758-760). The test showed "some mild degenerative changes of the lumbar spine" and also showed a borderline aneurysm in the iliac artery with mild to moderate hardening and blockage in the right internal iliac artery, moderate narrowing of the left proximal external iliac artery, and mild hardening of the abdominal aorta and branch vessels.

On June 29, 2011, plaintiff saw Dr. Sharma for a follow up (Tr. at 538-539, 597-600). Plaintiff denied any symptoms. "Does not have any chest pain, shortness of breath, presyncope [lightheadedness] or syncope [fainting]." Dr. Sharma described plaintiff as very pleasant. His physical exam was normal. Plaintiff was "strongly advised" stop smoking.

On July 6, 2011, Barbara Martin, a social worker, completed a Mental Residual Functional Capacity Assessment (Tr. at 728-730). She found that plaintiff has slight difficulty

---

[19]


[20]CT Angiography is a minimally invasive medical test that helps physicians diagnose and treat medical conditions. In most cases a contrast material injection is needed to produce pictures of blood vessels in the body. CT angiography uses a CT scanner to produce detailed images of both blood vessels and tissues in various parts of the body. An iodine-rich contrast material (dye) is usually injected through a small catheter placed in a vein of the arm. A CT scan is then performed while the contrast flows through the blood vessels to the various organs of the body. After scanning, the images will be processed using a special computer and software and reviewed in different planes and projections.

37

in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

She found that plaintiff has moderate difficulty with the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

She found that plaintiff has marked difficulty with the following:

- The ability to sustain an ordinary routine without special supervision

- The ability to accept instructions and respond appropriately to criticism from supervisors

And she found that plaintiff had extreme difficulty with the following:

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

When asked to explain the clinical observations and tests used in making this determination, Ms. Martin wrote:

> Client would be unable to be present for work regularly due to psychiatric appointments and therapist, case manager and doctor. Client has a number of medical problems that would prohibit his work attendance.

> Client has trouble staying focused for an hour at a time and has trouble with task oriented procedures. Client has to be able to get up and move around frequently.

She believed that plaintiff's impairments or treatment would cause him to be absent from work more than three times a month and that these limitations began in August 2004.

She also completed a Mental Impairment Evaluation for listings 12.04 and 12.06 (Tr. at 731-734). She found that plaintiff has extreme difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace. She did not evaluate his restriction of activities of daily living or any episodes of decompensation.

Ms. Martin supported these findings by indicating that plaintiff suffers from appetite disturbance with change in weight, sleep disturbance, decreased energy, difficulty concentrating or thinking, thoughts of suicide and hallucinations, delusions or paranoid thinking. Despite leaving blank the assessment of repeated episodes of decompensation each of extended duration on the Medical Source Statement, she indicated on this Mental Impairment Evaluation that plaintiff did indeed suffer from repeated episodes of decompensation, each of extended duration (Tr. at 733).

On July 14, 2011, plaintiff saw Barbara Martin (Tr. at 897-898). Plaintiff's father was in a nursing home at least for the time being, and his mother was in the hospital. He was taking care of the home and cleaning. He said his father almost burned down the house.

39

Plaintiff was scheduled for surgery the next day. "He is so involved in the current situation he cannot work on his issues. He is using good coping skills which is an improvement."

On July 15, 2011, plaintiff saw Dr. Lukens for a follow up on claudication of his legs (Tr. at 762-772). Plaintiff had tried exercising without improvement. Plaintiff was noted to be a long-time smoker. Dr. Lukens performed a left femoral to below-knee popliteal bypass (see footnote 19). He was discharged on July 19, 2011.

On July 26, 2011, plaintiff saw Kristie Luper (Tr. at 893-894). He had been sleeping well. He said all day he worries about what is going to happen with his disability and said he feared he was not going to win his case. Plaintiff complained that he worked for 13 years and paid into the system and he thinks he "should be able to get that money now that he is having all of the heart and vascular problems as well as the mental problems that he is having." Plaintiff was very worried that he would get SSI but it would not be enough to live on, or he would not be able to get HUD help due to his conviction, or that he would not get anything. He reported feeling worse after having met with his lawyer who told him he could not get back pay to 2004 when he stopped working, he could not collect any money for when he was in prison, and he may not be able to draw SSD at all.

On July 28, 2011, plaintiff saw Barbara Martin (Tr. at 891-892). He expressed worry over his upcoming disability hearing. He was waking with a cane and appeared to be in some pain due to his surgery a week earlier.

On August 11, 2011, plaintiff's disability hearing was held before an administrative law judge.

On August 12, 2011, plaintiff saw Kristie Luper (Tr. at 889-890). He had been sleeping fairly well. He had been trying to get his parents to go through the house and get rid of some things and was not having any luck with that. "Client reports that one day they agree to get rid of stuff and the next day they change their minds." Plaintiff was trying to get them to

40

downsize because they needed to be in an assisted living facility. His father was on a restricted amount of liquid due to fluid retention and his father was "sneaking water." Taking care of his parents was stressful but plaintiff said he was doing his best.

On August 25, 2011, plaintiff saw Barbara Martin (Tr. at 887-888). He was dealing with his situation with his aging parents who were suffering from dementia. He continued to be worried about his disability hearing.

On September 8, 2011, plaintiff saw Barbara Martin and reported that his parents were requiring even more care (Tr. at 885-886). He was doing most of the housework, he was taking them to their appointments and he was needing to make decisions for them. He said he had never been very good at making decisions.

On September 9, 2011, plaintiff saw Kristie Luper and reported that he was trying hard to be positive (Tr. at 883-884). He was having difficulty with his parents not being decisive about getting rid of things around the house. He stated that when he was out running around to appoints he was ok, but if he was at home he may nod off and take a nap during the day.

On September 22, 2011, plaintiff saw Barbara Martin who noted that he was doing fairly well (Tr. at 881-882). His parents were becoming more physically impaired. He was progressing with completing his responsibilities.

On October 13, 2011, plaintiff aw Barbara Martin (Tr. at 877-878). She noted that he was getting accustomed to feeling more level and not experiencing the severe mood swings and depression. "Client has shown good improvement in the past year." He had a positive attitude.

On October 27, 2011, plaintiff saw Barbara Martin (Tr. at 875-876). He discussed his situation at home and taking care of his parents. "Client shows progress on insight and ability to accept responsibility."

41

On October 28, 2011, plaintiff saw Kristie McAninch and indicated that his mind was racing and he was still waiting to hear about his disability (Tr. at 873-874). He had not been exercising much.

On November 9, 2011, plaintiff spoke with Barbara Martin over the phone (Tr. at 871). He said he was upset and depressed over finding out his disability was denied and he was not going to come in the next day for his appointment or therapy. Ms. Martin convinced plaintiff to come in the next day.

On November 10, 2011, plaintiff saw Barbara Martin (Tr. at 869-870). Plaintiff was depressed. "He obtained his decision about his disability and was upset. He stated he had not taken his medications for two days." Plaintiff complained that he could not maintain concentration or focus. Plaintiff said he was going to contact his lawyer.

On November 11, 2011, plaintiff saw Kristie McAninch (Tr. at 867-868). He complained that the psychiatrist would find that he was doing well without referring to documentation from plaintiff's therapist or case manager. He reported struggling daily but taking his medication "because he knows that he has to as this is part of his parole." Plaintiff was unhappy about the disability judge determining that "client being compliant with all of this means that client could hold down a job when client failing to do any of these means that client will go back to prison." Ms. McAninch recommended that plaintiff contact his lawyer about appealing the decision to find out what needs to be done.

On November 18, 2011, plaintiff saw Kristie McAninch (Tr. at 865-866). He reported that he continued to attend all of his appointments as scheduled. Plaintiff reported feeling moody and having racing thoughts. Plaintiff was waking up at 4 am and feeling rested, but then later in the day he would take a nap. He was trying to walk the dog but was not otherwise getting much exercise.

42

On December 15, 2011, plaintiff saw Dr. Lukens for a follow up on right leg claudication (Tr. at 748-750). His symptoms had worsened since June when it had been characterized as "moderately diffused disease." He had undergone a right femoral to popliteal bypass (see footnote 19) on the left side which had been working well. During a review of plaintiff's "problems and past medical history" he did not mention arthritis or back pain. He indicated he was no longer smoking. He was taking no pain medication other than a non-steroidal anti-inflammatory, Naproxen. He was assessed with severe claudication (blockage) in the right leg and agreed to undergo an angiography.

On December 23, 2011, plaintiff underwent an abdominal aortogram with right lower extremity runoff (see footnote 18) with a right superficial femoral artery stent placement which resolved his stenosis (narrowing of the blood vessel) (Tr. at 750-756).

On February 9, 2012, plaintiff saw Barbara Martin (Tr. at 846-847). He appeared to be in a low mood. He talked about getting off parole in April. He said he was not worried about committing another sex offense but he was more concerned about decision making and falling into traps.

On February 23, 2012, plaintiff saw Kristie McAninch (Tr. at 844-845). He was taking his medication as prescribed, he denied adverse side effects, and he was sleeping 5 to 7 hours every night. He was walking three times a week and was eating a heart-healthy det. He reported that some days he feels negative about life but other days he feels positive. He felt stuck in a rut "but knows that [he] put himself there and is continuing to deal with the consequences of what he did."

On March 16, 2012, plaintiff saw Kristie McAninch and reported having trouble sleeping (Tr. at 840-841). Ms. McAninch recommended he write in a journal before going to bed.

On March 22, 2012, plaintiff saw Barbara Martin (Tr. at 838-839). He reported experiencing depression daily. He was having feelings of paranoia and having "low feelings" about himself and getting off parole. He was due to be off parole in the next month (Tr. at 841).

On April 26, 2012, plaintiff met with Kristie McAninch (Tr. at 834-835). He said he was tired of dealing with stuff and waiting on disability. He said in the past he always had to have something going on but now he feels like he is being watched in the community because everyone knows him. Plaintiff reported taking his medication as prescribed and having no side effects. He was sleeping better. He continued to walk and eat right when he was not experiencing depression.

On May 10, 2012, plaintiff saw Barbara Martin (Tr. at 832-833). He was upset about his parents recently being in the hospital and reported being overwhelmed with taking care of them. He said he is unable to take care of all of their needs and he does not take his medications when either of his parents is in the hospital. He started having delusions, hallucinations and paranoia when he was off the medications for a week.

On May 18, 2012, plaintiff saw Kristie McAninch (Tr. at 830-831). He had been off his medications for a week while his mother was in the hospital. He reported racing thoughts while he was off his medication. He said after taking care of his parents all day and running around with them, he was completed exhausted and was able to sleep well. He was using a push mower to cut the grass, gardening and taking care of flower beds. He recently saw a vascular surgeon for a follow up, everything checked out and he does not have to go back for 3 months. He reported having alternating days of feeling good and feeling depressed.

On May 24, 2012, plaintiff saw Barbara Martin (Tr. at 828-829). He reported being tired 2 or 3 days a week. He reported that he had started seeing shadows more than he did. He reported being under great stress due to the continuing declining health of his parents. He

44

becomes overwhelmed with the responsibilities of caring for them.

On June 8, 2012, plaintiff saw Kristie McAninch (Tr. at 826-827). He had not been getting out and walking much but had been using a push mower to cut the grass. He reported working in the garden and spending time in the garage. Plaintiff reported good days mixed with bad days when he wants to stay inside and not do anything. He said he is back on his medication.

On June 26, 2012, plaintiff saw Kristie McAninch (Tr. at 822-823). Plaintiff reported missing doses of his medication here and there due to getting in moods where he does not want to take it. The bottle of pills he just started taking was due to be refilled on July 5, so he indicated he had missed quite a few. He was not eating healthy food (was eating sweets instead) and denied getting any exercise. He reported feeling paranoid and said his anxiety and depression had been high. He alternates between good days when he does a lot and bad days when he sleeps all day. Plaintiff was told to take his medication consistently.

On July 13, 2012, plaintiff saw Kristie McAninch (Tr. at 817-818). Plaintiff was not taking his medication consistently. He reported sleeping all day sometimes. He said he saw a new cardiologist recently and does not have to go back for another six months. He reported having days with no energy or motivation but denied feeling suicidal. Ms. McAninch told plaintiff to take his medication consistently.

On July 26, 2012, plaintiff saw Kristie McAninch (Tr. at 815-816). Plaintiff said he took his medication as directed during the past two weeks but feels like it is not helping him because he still has days when he is down. Plaintiff had been out weeding his garden and flower beds that morning. He reported having 2 or 3 nights per week when he wakes feeling unrested and then sleeps of and on during the day. Ms. McAninch warned plaintiff not to go off his medication.

On August 9, 2012, plaintiff saw Barbara Martin (Tr. at 813-814). He was observed to be in a fair mood, but Ms. Martin noted that plaintiff has a negative outlook on many things. He was worried about his daughter, he was worried that his health would get in the way of his hunting this fall, he was overwhelmed with his parents and the responsibility he felt at times. Plaintiff had not been taking his medication as directed, "wondering if it is worth taking them." He reported suicidal thoughts during his depressive states.

On August 10, 2012, plaintiff saw Kristie McAninch (Tr. at 811-812). Plaintiff reported that he had not noticed a change in his cycling and moods or depression. He had been weeding and watering his garden on the days when he felt like getting out of the house. He reported some good days and other bad days when he sleeps all day.

On August 30, 2012, plaintiff saw Kristie McAninch (Tr. at 809-810). Plaintiff reported being in a lot of pain from his accident and unable to do anything. He reported daily depression. He was upset about not being able to start bow season as he would not be able to get out to his spot with his injuries. He said he wanted to tell the psychiatrist that his medications were not working.

On September 13, 2012, plaintiff saw Barbara Martin (Tr. at 807-808). Plaintiff indicated he had been in a motorcycle accident on August 16 after which he was taken by ambulance to the hospital. He said he had rib fractures and was told he had no other breaks but his left foot continued to be swollen. He had been given a prescription for Vicodin (opioid pain medication) and was told to elevate his foot.

On September 14, 2012, plaintiff saw Kristie McAninch (Tr. at 805-806). Plaintiff continued to be worried about his foot and had an x-ray taken that morning. His pain medication had been interfering with mood stabilization. Plaintiff said the next day he was planning to go out in the woods to spot for deer but "he may not be able to leave the house because he may wake up and be depressed and have to stay in bed all day."

46

On September 18, 2012, plaintiff James Fleming, M.D. (Tr. at 861-862). Dr. Fleming had received a memo from Kristie McAninch indicating that plaintiff is "more compliant" with his medication the past two months but was still experiencing shifting moods, variable sleep, not wanting to get out of bed on some days. Ms. McAninch also reported that plaintiff had a suppressed appetite on days, "but [Dr. Fleming remarked that] in reviewing the record I see he has also gained twenty-five pounds since October of last year and eight pounds since April." Dr. Fleming noted that Dr. Wisdom's notes indicated plaintiff's medications were staying the same, the nurse's note indicated Seroquel was dropped to 200 mg daily, and plaintiff said the dose was increased from 600 mg to 800 mg each day, hence some confusion over his medication. Plaintiff reported auditory hallucinations telling him to hurt himself and he sees things out of his peripheral vision which makes him paranoid. "Interestingly, the psychotic symptoms were not mentioned in the note by the community support specialist", i.e., Ms. McAninch. Plaintiff stated that he had not used alcohol since 2006 or other drugs since 2005. He was smoking about a half a pack of cigarettes a day and continued to drink 25 to 30 cups of coffee each day. Dr. Fleming observed that plaintiff was cooperative, made good eye contact, had well organized though processes and goal oriented speech. His mood was depressed. Insight and judgment were fair. Dr. Fleming noted the differing Axis II diagnoses in plaintiff's medical records and questioned whether he has antisocial personality disorder as listed. He questioned whether plaintiff has manic episodes and suggested he may have schizoaffective disorder as opposed to bipolar disorder as previously assessed. He adjusted plaintiff's medications and indicated he would review plaintiff's blood work when the results were available.

On September 27, 2012, plaintiff saw Barbara Martin and reported having broken three toes on his left foot (Tr. at 803-804). He said his new medication was working somewhat better although he reported seeing shadows and having paranoid feelings of

47

someone watching him. He said he hears voices, some days worse than others, and the voices tell him to hurt himself. He continued to feel overwhelmed with his parents.

On September 28, 2012, plaintiff saw Kristie McAninch (Tr. at 800-801). Plaintiff's foot was still large and black and blue from his accident on the dirt bike. Plaintiff said the emergency room doctor took an x-ray of plaintiff's ankle but not his foot and plaintiff thought his foot was broken. He reported feeling depressed and sometimes he sleeps all day. Plaintiff was depressed about not being able to bow hunt since his accident and he had been looking forward to that.

On October 11, 2012, plaintiff saw Barbara Martin (Tr. at 798-799). Plaintiff said he feels like his medication causes him to have a hangover in the morning. Ms. Martin called the nurse in the psychiatrist's office and was told that plaintiff should take his medication earlier in the morning and try taking only one Tegretol instead of two at bedtime until he sees the doctor. Plaintiff reported mood swings and depression. He said he has suicidal thoughts frequently but denied any plan. He reported a lack of motivation but said if he can get started on something like yard work in the morning then he is not so depressed.

On October 12, 2012, plaintiff saw Kristie McAninch (Tr. at 796-797). They discussed plaintiff's decision to stick with his same dose of daytime medication despite being told by the psychiatric nurse to cut back on it.

On November 2, 2012, plaintiff saw Kristie McAninch (Tr. at 794-795). Plaintiff reported having "dead spots" in his days when he is unable to function at all. He sits around or sleeps. He said when he works outside or goes hunting, he really has to force himself to do those things, although he discussed having gotten up at 3:30 that morning to go hunting with his son.

On November 7, 2012, plaintiff saw Dr. Fleming (Tr. at 860). Plaintiff was observed to be generally well groomed. He made good eye contact and was cooperative. There were no

48

overt psychotic symptoms "although he did say occasionally he hears voices." His mood was mildly depressed to euthymic (normal) with appropriate affect. Dr. Fleming switched plaintiff to immediate release Seroquel instead of extended release and told him to take it at bedtime. He continued Zoloft and Trazodone, and he increased Tegretol.

On November 8, 2011, plaintiff saw Barbara Martin (Tr. at 792-793). Although Ms. Martin observed that plaintiff was in a better mood, he reported some paranoia and said he feels he is being watched. Plaintiff was looking forward to black powder hunting and had been target practicing which relieves his depression. "Client stated if he can get on 'one subject' and get started he does better. If he cannot get focused he is becomes [sic] distracted he quits trying to do anything." Plaintiff also talked about duck hunting. Ms. Martin recommended he get out and hunt and stay in contact with his children.

On November 15, 2012, plaintiff saw Kristie McAninch (Tr. at 790-791). Plaintiff reported continuing to have periods of depression but said they were better on his new medication than in the past year. Plaintiff had been going out hunting and he got a deer over the past week. He needed help getting it out of the woods but he was excited. Plaintiff reported anxiety over contacting a lawyer to help with his foot. He reported that he "can barely walk on it after all this time." He did not explain his ability to go into the woods and hunt while also barely being able to walk.

On December 12, 2012, plaintiff saw Dr. Fleming (Tr. at 858-859). "He reports some ongoing mood swings, 'ups and downs' which are relatively short lived and no major worsening or psychiatric symptoms. He actually feels better on a much lower dose of Seroquel which I had him up to 800 mg per day of the extended release. Now he is taking 100 mg q.h.s. [at bedtime]." Plaintiff continued to take Tegretol, Trazodone and Zoloft. Plaintiff was observed to be well groomed, he made good eye contact, and he was cooperative. His mood was anxious and depressed. There were no overt psychotic symptoms "although . . . last time

49

he reported occasionally haring voices." "Regarding the disability, he asked if I would help him with this by filling out forms from his attorney. He said he last worked in 2004 when he lost his license due to alcohol use and had to quit his job driving a bread truck which he had done for fourteen years full-time. I explained to him that this would argue against him being able to claim that he can't work, especially since he has regained his license and could potentially go back to the same job. He said he is unable to work because of physical and emotional problems. I asked him to write out at least several paragraphs explaining this in more detail and I said I would be willing to look at the possibility of helping him with disability. He will return within the net two months."

On December 13, 2012, plaintiff saw Barbara Martin for individual psychotherapy (Tr. at 788-789). He reported being in a mildly depressed mood. He had been trying to get his son and daughter together to mend their relationship before his son left for California. Plaintiff reported feeling trapped and said he still thinks of suicide in the back of his mind. He reported some paranoia when in stores.

On December 31, 2012, plaintiff saw Kristie McAninch (Tr. at 786-787). Plaintiff said he had not been exercising. At his last doctor's appointment he had lost 25 pounds which made him feel better overall. He reported battling depression daily. He reported having gone hunting with both his children recently which he enjoyed. Over the holiday he and his daughter went hunting. He also got into the Christmas spirit this year and decorated the house which he enjoyed. He reported still having some down days when he does not accomplish much but his down days are not nearly as severe as they used to be and his current medications are better at helping him manage his moods. He was completely off Seroquel but had a prescription for it in case he felt he needed it. He reported being able to sleep without the aid of medication. Ms. McAninch recommended plaintiff try to walk twice a week to assist with weight loss.

50

*D.*      *SUMMARY OF TESTIMONY*

On August 9, 2011, the Honorable George M. Bock conducted an administrative hearing on plaintiff's claim (Tr. at 39-54). During the hearing, plaintiff testified; and Alyssa Smith, a vocational expert, testified at the request of the ALJ.

1.      **Plaintiff's testimony**

Plaintiff testified that he was 53 years old with a high school education (Tr. at 44). He last worked in 2004 delivering bread for Sarah Lee Bread Company (Tr. at 44). Plaintiff worked as a driver for almost 14 years (Tr. at 44). Plaintiff said that he received a DWI and could no longer drive, and so he lost his job (Tr. at 44). He lived with his 70-year-old parents and helped with dishes, cooking, dusting around the house, and mowing the lawn (Tr. at 45).

His depression is the reason he cannot work (Tr. at 45). Some days he can control his depression but otherwise it is constantly there and causes severe mood swings, feelings of worthlessness, body aches and pains, and disturbances in his sleep (Tr. at 46). These uncontrolled episodes happened once or twice a week (Tr. at 46). He hears voices every day and there are three different voices (Tr. at 46). He also sees shadows which cause him to be paranoid (Tr. at 47). Plaintiff sees the shadows four or five times a day (Tr. at 47).

Plaintiff had bypass surgery on his left leg and had not been released to drive at the time of the hearing (Tr. at 45). He has physical problems that affect his ability to work including a heart stent, a blocked major artery, COPD, arthritis, bypass surgery then-recently performed on his left leg, and problems with his right leg (Tr. at 47-48). Plaintiff has to pace himself cooking or doing the dishes (Tr. at 48).

Plaintiff estimated that he can stand 30-45 minutes and walk half a block without resting (Tr. at 48). He has to stop these activities because of shortness of breath, pain in his legs and hips, and pain in his chest (Tr. at 48). Plaintiff sleeps well and takes a one- to two-hour nap daily because of fatigue (Tr. at 49).

51

2.    **Vocational expert testimony**

The vocational expert testified that plaintiff could not perform his past relevant work (Tr. at 51), but could perform other work in the economy as a collator operator (DOT 208.685-010), folding-machine operator (DOT 208.685-014), and price marker (DOT 209.587-034) (Tr. at 51).

The expert also found that if plaintiff missed more than one day of work a month, all available work would be eliminated (Tr. at 52). The expert also acknowledged that the limitations contained in therapist Barbara Martin's opinion would prevent plaintiff from working (Tr. at 52-53).

## V.    *FINDINGS OF THE ALJ*

On October 27, 2011, the ALJ entered his decision denying plaintiff's claim (Tr. at 20-33).

The ALJ found that plaintiff had the following severe impairments: antisocial personality disorder, depression, coronary artery disease (status post-stent placement) and peripheral vascular disease (status post-bypass surgery) (Tr. at 22). However, the ALJ found that plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1 (Tr. at 23). The ALJ determined that plaintiff retained the residual functional capacity to perform light work except that he must avoid extremes of hot and cold; could only occasionally perform postural activities (i.e., balancing, stooping, kneeling, crouching, crawling, and climbing); could not use ladders, ropes, or scaffolds; could not work with the public; and could tolerate only occasional interaction with coworkers and supervisors (Tr. at 25).

The ALJ found that plaintiff's impairments would not prevent him from performing work that exists in significant numbers in the national economy including work as a collator

Case 4:13-cv-00266-REL    Document 17    Filed 09/29/14    Page 52 of 65

operator, price marker, or folding-machine operator (Tr. at 32). Therefore, the ALJ concluded that plaintiff was not disabled (Tr. at 33).

## VI.     ANALYSIS

Plaintiff raises three issues for review: (1) whether the ALJ employed the proper standard for the burden of proof; (2) whether the ALJ's residual functional capacity assessment is supported by substantial evidence in the record; and (3) whether the ALJ's assessment of a medical source opinion provided by plaintiff's therapist is supported by substantial evidence in the record.

### A.     THE PROPER BURDEN-OF-PROOF STANDARD

Plaintiff complains that ALJ used an incorrect standard in analyzing the evidence in his case. Plaintiff states the ALJ incorrectly decided his case under the preponderance-of-the-evidence standard, not the substantial-evidence standard. This argument is without merit.

The regulations provide that an ALJ's decision must be based on the preponderance-of-the-evidence standard. 20 C.F.R § 404.953(a) provides in relevant part that "[t]he administrative law judge must base the decision on the preponderance of the evidence offered at the hearing or otherwise included in the record." The substantial-evidence standard, on the other hand, is the district court's standard of review. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).

There is nothing in the record to support the argument that the ALJ used an incorrect burden of proof in resolving plaintiff's claim.

### B.     OPINION OF TREATING THERAPIST BARBARA MARTIN

Plaintiff complains that the ALJ improperly rejected the medical source statement made by Barbara Martin, his therapist, who treated plaintiff from the time of his release from prison in early 2010 until the end of 2012. Ms. Martin's specific findings appear on pages 37-39 of

this order. Plaintiff argues that Ms. Martin's opinions are supported by her treatment notes and should not have been given only partial, limited weight.

Social Security Ruling (SSR) 06-3p clarifies how SSA considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902. Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1.     Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2.     Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

3.     Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other care givers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this

purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. quoting SSR 06-3p. In general, according to the ruling, the factors for considering opinion evidence include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

The ALJ had this to say about Ms. Martin's opinion:

> She completed a "Mental Residual Functional Capacity Assessment" on July 6, 2011, in which she assessed the claimant as having marked to extreme limitations in several areas. Ms. Martin also completed a "Mental Impairment Evaluation" that indicated the claimant would meet listings 12.04 and 12.06. Under the Social Security Regulations, a social worker is not defined as an acceptable medical source and the opinion from such a treating professional is not entitled to controlling weight (20 CFR 416.913). Instead, the opinion of Ms. Martin must be evaluated according to the factors outlined in 20 CFR 416.927(d), as well as carefully considered under Social Security Ruling 06-3p. In light of that ruling, I have fully considered that social workers often help treat a variety of psychiatric illnesses. Although Ms. Martin has a well-established treatment relationship with the claimant, Ms. Martin's assessment of very low functioning in various areas (including the ability to interact socially, perform activities within a schedule and sustain an ordinary routine without special supervision) are not supported by the treatment records. Those records reflect that the claimant has depression and antisocial personality disorder, which is well controlled by medications. Ms. Martin routinely assesses the claimant's GAF in the 30's, which is also inconsistent with an individual doing well with treatment and medications. Therefore, the assessment from Ms. Martin is only entitled to partial, limited weight to the extent it is supported by the medical evidence of record.

(Tr. at 30).

Here, the contemporaneous records from plaintiff's treating psychiatrists, his other medical providers, and even Barbara Martin herself, do not support the conclusion that

plaintiff is unable to work due to his physical and mental impairments.

Less than two months before Ms. Martin rendered the opinion at issue, she noted in her own treatment records that plaintiff "shows to be somewhat stable at this time." Two months before the opinion, plaintiff's treating psychiatrist noted that plaintiff "seems full of energy and it was reported his progress has been good." His medications were kept the same which indicates that plaintiff's psychiatrist thought his mental impairment was adequately controlled. Elsewhere in Ms. Martin's treatment records are her findings with regard to why plaintiff was not working: On October 14, 2010, she noted that plaintiff was unable to find work due to his criminal charges. On October 28, 2010, she noted that plaintiff had not fo und a job but "it doesn't appear he can take care of his parents and have a job". On April 28, 2011, she stated that plaintiff does not work "due to physical problems." Nowhere in her treatment records does she suggest that plaintiff is unable to work because of his mental impairment. Nowhere in her treatment records does she suggest the functional limitations which she found in her residual functional capacity assessment.

During the time that Ms. Martin found plaintiff to be markedly and extremely limited in his mental functioning, she was aware that he was running his own household, that he was helping his elderly parents with their day-to-day lives, he was able to manage a hectic schedule of getting his parents to their appointments, getting himself to his doctor appointments and the myriad appointments required as conditions of his parole, i.e., to the social worker, to the case worker, to the psychiatrist, to sex offender classes, etc. There is no reference in this multi-year record to plaintiff ever being late for appointments, looking disheveled or unclean, being unable to communicate effectively, being unable to interact appropriately with all of the medical personnel he encountered, not understanding what was being said, thinking irrationally, etc. He was depressed, anxious, worried and stressed about caring for his parents, about fulfilling all of the requirements of his parole, about getting an

award of disability. However, there simply is not evidence that plaintiff suffered from a disabling mental impairment. Instead, the records clearly show that plaintiff remains unemployed as a consequence of his status as a sex offender and his busy schedule caring for his elderly parents. While these are unfortunate circumstances, this is not a basis upon which to award plaintiff Social Security disability benefits. Plaintiff complained to his case worker that he was essentially caught in a catch 22 -- because he kept all of his appointments and juggled his hectic schedule, the disability judge found that he could hold down a job; but if he did not do all of these things, he would go back to prison. The question is not what plaintiff chooses to do, however. It is what he **can** do. The only reason Social Security disability benefits are awarded is because the claimant is **unable** to perform any job in significant numbers; not because he chooses not to work, not because he has to care for family members, not because he has to keep a lot of appointments as a condition of parole.

Contrary to Ms. Martin's opinion, she and the other medical providers have consistently encouraged plaintiff to increase his daily activities by securing his driver's license, exercising, mowing the lawn, tending to his garden and flower beds at his parents' house, hunting for deer, hunting for mushrooms, participating in vocational rehabilitation, and seeking employment. These activities have been touted by mental health professionals as effective coping mechanisms designed to help plaintiff deal with his depression and other conditions. There is no entry in the record from any provider that discourages plaintiff from doing any activity or one that sets any limit on an activity based on plaintiff's physical or mental impairments; instead, the limitations in Ms. Martin's opinion are based on plaintiff's self-reporting of what he can and cannot do.

Looking specifically at the functional restrictions found by Ms. Martin, it is clear that they are not based on her own treatment records or those of the case worker and psychiatrist in her office. She found limitation in plaintiff's ability to adhere to basic standards of neatness

57

and cleanliness even though plaintiff was never observed to be anything other than well groomed with good hygiene. She found that he was moderately limited in the ability to ask simple questions or request assistance; however, all of these treatment records show that plaintiff had no difficulty asking for assistance in getting his Medicaid paperwork together, finding pharmacies, attempting to locate alternate housing when he was not getting along with his parents, in getting to his lawyer's office and to his disability hearing (his caseworker agreed to drive him to those appointments), in intervening with the psychiatrist by writing notes to him prior to plaintiff's appointments, etc.

Ms. Martin found that plaintiff was moderately limited in his ability to be aware of normal hazards and take appropriate precautions, yet plaintiff was advised to and did go hunting. He drove his parents to appointments and drove himself to appointments almost daily. I cannot imagine a "normal hazard" that plaintiff would be unable to recognize while maintaining the ability to use a black powder gun and a bow and arrow.

She found that plaintiff was moderately limited in his ability to travel in unfamiliar places; however, the record reflects that plaintiff drove his parents to appointments and to run errands, plaintiff drove himself to see psychiatrists, cardiologists, gastroenterologists, vascular specialists, social workers, parole officers, case workers, and to sex offender classes and hospitals for tests and treatment.

She found that plaintiff was markedly limited in the ability to sustain an ordinary routine without special supervision; however, for years plaintiff was able to manage his parents' household despite their symptoms of dementia, their frail health, their controlling nature at times, and their arguing. He managed their care, he cooked for himself and them, he cleaned the house, and he took them to their doctor appointments and to run errands. And he did all of this without any supervision.

58

She found that plaintiff was markedly limited in his ability to accept instructions and respond appropriately to criticism from supervisors; however, there is no evidence to support this. Plaintiff was noted to be polite and cooperative to every doctor, counselor, nurse, caseworker and social worker in this record. He never responded inappropriately to anyone during the six and a half years covered by these medical records. He attempted to do everything his parole officer required of him, everything his doctors asked him to do, everything his caseworker and social worker asked him to do. He struggled with some of these things (i.e., smoking cessation or eating a heart-healthy diet), but he never had any difficulty accepting instructions from anyone.

She found that plaintiff was extremely limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. However, there is not one record that shows plaintiff arriving late for an appointment. He had a very busy schedule with making all of his own appointments and getting his parents to all of their appointments, and he did it successfully.

Ms. Martin's opinion that plaintiff's impairments or treatment would cause him to be absent from work multiple times a month is unfounded -- plaintiff's appointments though numerous were for the most part a condition of his parole, not required by his physical or mental impairments.

Ms. Martin stated that plaintiff's limitations began in August 2004; however, she did not begin seeing plaintiff until February 16, 2010. And when he was originally seen by a prison mental health specialist in 2006, he denied many of the symptoms that Ms. Martin found were present not only then but two years earlier.

Finally, Ms. Martin noted that plaintiff did suffer from repeated episodes of decompensation, each of extended duration. There is absolutely no evidence that plaintiff has ever experienced any episode of decompensation.

59

In addition to Ms. Martin's opinion not being supported by her own records, her opinion is contradicted by the other medical records. In May 2006, plaintiff denied mental symptoms and his mental status exam was normal. He did not mention suffering from any anxiety until January 2009 even though he originally claimed to have become disabled in 2004. Most of plaintiff's mental symptoms in prison occurred during his final year of incarceration and were based on his worry about his placement in the prison, his cell mate, when he would be released on parole. Almost all of plaintiff's mental symptoms (i.e., anxiety or depression) after his release from prison were precipitated by unfavorable decisions on his requests for benefits or difficulties living in his parents' home or struggles faced by plaintiff due to his status as a sex offender.

Although plaintiff periodically mentioned hearing voices, he made those claims only to his social worker until November 2012 when he raised this issue with Dr. Fleming, indicating that he "occasionally" hears voices. A month later, he asked Dr. Fleming to help him by filling out disability forms. Dr. Fleming was not very encouraging since plaintiff said he stopped working due to losing his license and he had since regained his license; and plaintiff did not bring up hearing voices anymore after that day.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's decision to give little weight to the opinion of Barbara Martin.

C.  *PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT*

Plaintiff next challenges the ALJ's determination of the residual functional capacity on two grounds alleging that: (1) the ALJ did not address a note made by an agency employee on February 2, 2010, recounting that plaintiff evidenced pain when getting out of a chair after a lengthy interview; and (2) the ALJ failed to include limitations based on one of his own findings in the residual functional capacity (i.e., mild difficulties in concentration, persistence, and pace).

60

While it is true that the ALJ did not address the employee's comment concerning plaintiff's appearing to be in pain after sitting through a lengthy interview, the point seems de minimus in view of the record that exceeds 900 pages. Further, the comment does not amount to evidence of any functional limitation considering the fact that it was based on plaintiff's appearance on February 2, 2010, but subsequent to that, plaintiff was able to do a lot more than stand up from a chair without difficulty. On April 14, 2010, he said he was walking more and going mushroom hunting. On June 10, 2010, he said he had been gardening. By July 8, 2010, he had undergone job training as a dishwasher, he was taking care of his elderly parents, he was doing the cleaning and most of the cooking. During the summer of 2012 he was using a push mower regularly and he continued to garden, take care of flower beds, and take care of his parents and their home. He walked his dog multiple times a day. In the fall of 2012 he was riding a dirt bike. In November 2012, he was went deer hunting on multiple occasions and walked through the woods scouting spots. In December 2012 he decorated his house for Christmas. Clearly this one instance of being in a chair while beginning the process of applying for disability benefits was not representative of plaintiff's functional abilities.

Further, the ALJ's opinion acknowledges the need to consider a claimant's pain when deciding a case and specifically addressing plaintiff's back pain and hip pain (Tr. at 23, 26). An ALJ is not required to discuss every piece of evidence in the record, and the fact that specific testimony or an exhibit was not discussed in a decision does not mean that it that it was not considered. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010). Additionally, an ALJ does not have to articulate a separate rationale for a specific piece of evidence when the decision considered and addressed the same type of evidence in another context. Buckner v. Astrue, 646 F.3d 549, 559-560 (8th Cir. 2011). Here, the ALJ did precisely that -- he considered plaintiff's pain and discounted it as a disabling factor based on the record as a whole.

Plaintiff also alleges that the ALJ failed to include his own findings in the residual functional capacity assessment, specifically, the ALJ's finding of mild difficulties in plaintiff's concentration, persistence, and pace.

While it is true that the ALJ did not include his finding of plaintiff's mild difficulties in concentration, persistence, and pace in the assessment, there was no requirement that he do so. Mild limitations in any of the four domains of mental functioning are non-severe (20 C.F.R. §§ 404.1520a(d)(1); 416.920a(d)(1)) and therefore by definition cause no work-related limitations of function (20 C.F.R §§ 404.1521(a); 416.921(a)).

Plaintiff argues that the ALJ had a duty to develop the record further by obtaining a consultative examination because the ALJ discredited the two mental opinions in the record and there were no physical opinions in the record. The ALJ discounted the opinion of a non-examination psychologist who found that plaintiff's mental impairment is not severe. And he discounted the opinion of Barbara Martin as discussed above.

Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013); 20 C.F.R. § 404.1512. Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Kamann v. Colvin, 721 F.3d at 950, quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994). Failing to develop the record is reversible error when the record does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work. Byes v. Astrue, 687 F.3d 913, 915-916 (8th Cir. 2012).

Here there is a voluminous record including dozens upon dozens of visits by plaintiff to psychiatrists, social workers, and case workers. There is more than enough evidence on which to base an opinion with regard to plaintiff's mental limitations.

62

Likewise there is sufficient evidence in the record to support the ALJ's findings with respect to any limitations caused by plaintiff's coronary artery disease and peripheral vascular disease. After plaintiff's cardiac procedures, it was noted that his condition had resolved. In March 2011 Dr. Sharma stated that plaintiff could increase his activity as tolerated. In April 2011 his cardiac follow up was normal. Plaintiff's mental record reflect that he told his counselor that his follow up appointments indicated that everything was good and he did not need to return for a recheck for another 3 to 6 months. Plaintiff was never advised to limit his physical activity as a result of these conditions. In fact, he was repeatedly told to exercise.

The substantial evidence in the record establishes that plaintiff was interested in collecting disability and working part time until (1) he encountered difficulties in finding employment due to his prior sex offense, and (2) his life became too busy with taking care of his elderly parents while trying to satisfy all of the requirements of his parole supervision.

To illustrate, on February 26, 2010, plaintiff reported that he would like to receive some training in taxidermy or vocational rehabilitation. On March 8, 2010, plaintiff requested a referral to vocational rehabilitation. On March 12, 2010, plaintiff asked again to be referred to vocational rehabilitation. On March 19, 2010, plaintiff discussed the status of his referral to vocational rehabilitation and his need to work in the garden with the flowers and mowing the lawn, which helped with his depression. On April 13, 2010, plaintiff said he had met with vocational rehabilitation that day. On June 24, 2010, plaintiff discussed the job training he was scheduled to take the next day, taking care of his parents and his need for a break in that responsibility, his desire to find part-time work, his busy work in the garden and yard, and his need to secure a driver's license so he could attend all his appointments without having to rely on his parents to take him. On July 8, 2010, plaintiff said he had been to vocational rehabilitation, worked as a dishwasher for a morning, and wanted to take a part-time job there. On July 22, 2010, plaintiff said he did not get the dishwashing job at the

63

Country Kitchen because he is a sex offender. On August 5, 2010, plaintiff expressed his frustration with losing the job opportunity at the Country Kitchen because of his sex offense and said that he was going to start looking for work with the assistance of Community Options in Cameron, Missouri. On August 12, 2010, plaintiff discussed his efforts to find part-time work and his then-current work with Community Options and vocational rehabilitation. On September 23, 2010, plaintiff discussed his problems finding work due to his sex-offender status and expressed his hope of moving to St. Joseph in search of work. He also said he was about to get his driver's license restored so that he could take his ailing parents to their many medical appointments, and he discussed his depression over not being able to secure employment because of his sex-offender status.

On March 10, 2011, plaintiff reported that he and his disabled daughter were being kicked out of his parents' house and that he had no place to go because of his sex-offender status. On July 26, 2011, plaintiff told his case worker he was frustrated when he learned he could not collect disability back to 2004 (his alleged onset date) but said he understood that was not when he became disabled. He expressed his frustration at having paid into the system for 13 years and believing that he should awarded that money now. On December 12, 2012, plaintiff asked Dr. Fleming to write a letter in support of his disability appeal, even though the doctor had only seen plaintiff for about a month at the time and plaintiff admitted he had stopped working because he was a driver and lost his license to a DWI conviction. Dr. Fleming observed that plaintiff now had his license back, suggesting that he could potentially return to that same job.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

64

**VII. CONCLUSIONS**

Based on the forgoing analysis, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 29, 2014